UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** : | : | |
| | : | CASE NO. 23-cr-160 (RC) |
| v. | : | |
| | : | |
| **DANIEL BALL,** | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S MEMORANDUM**
**IN SUPPORT OF PRETRIAL DETENTION**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its oral motion that the defendant, Daniel Ball, be detained pretrial—pursuant to 18 U.S.C. § 3142(e)—as no condition or combination of conditions will reasonably assure his appearance or reasonably assure the safety of the community.

**Discussion**

At the detention hearing, this Court must consider the statutory factors that are outlined in 18 U.S.C. § 3142(g). These factors are:

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1691, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—
(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In considering the conditions of release described in subsection (c)(1)(B)(xi) or (c)(1)(B)(xii) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

1. **The Nature and Circumstances of the Offense Charged**

The crimes at the United States Capitol on January 6, 2021, are unlike any this nation has prosecuted in its history. "[T]he violent breach of the Capitol on January 6 was a grave danger to our democracy, and that those who participated could rightly be subject to detention to safeguard the community." *United States v Munchel*, 991 F.3d 1273, 1284-85 (D.C. Cir 2021). But in the nearly two-and-one-half years since its commission, this Court has had opportunity to consider the riot's uniqueness related to various statutes—§ 3142 is no different.

Soon after January 6, § 3142 was interpreted in *United States v Chrestman*, 525 F.Supp.3d 14 (D.D.C. 2021). The factors outlined by Judge Beryl A. Howell, "[t]aken together, as applied to a given defendant, . . . are probative of 'the nature and circumstances of the offense charged, 18 U.S.C. § 3142(g)(1), and, in turn, of the danger posed by the defendant . . .." *United States v Chrestman*, 525 F.Supp.3d 14, 27 (D.D.C. 2021) (Howell J.). Judicial Officers in this district have continued to use the *Chrestman* factors in interpreting detention decisions specifically in the January 6 context. *See*, *e.g.*, *United States v Matthew Krol*, ___ F. Supp. 3d. ___; 2022 WL 16948611 (D.D.C. 2022) (Contreras, J.).

> These relevant factors are:(1) whether the defendant has been charged with felony or misdemeanor offenses; (2) the extent of the defendant's prior planning; (3) whether the defendant used or carried a dangerous weapon; (4) evidence of coordination with other protestors before, during, or after the riot; (5) whether the defendant assumed a formal or de facto leadership role in the events of January

> 6, 2021, . . . and (6) the defendant's "words and movements during the riot"—*e.g.*, whether the defendant 'remained only on the grounds surrounding the Capitol' or stormed into the Capitol interior, or whether the defendant "injured, attempted to injure, or threated to injure others."

*United States v Whitton*, 534 F.Supp.3d 32, 41 (D.D.C. 2021) (Sullivan J.).

On May 10, 2023, an Indictment alleging eight separate felony offenses was filed against Daniel Ball. These felony offenses allege that Daniel Ball used an explosive device to assault officers in a confined space. After unsuccessfully attempting to push through the line of officers without a weapon, Ball lit and threw an explosive that ricocheted off an officer's face mask and exploded inside the tunnel entrance. The indictment also includes four additional misdemeanor offenses including an act of physical violence in the Capitol Grounds and Disorderly Conduct in a Capitol Building. In all, Ball is charged in twelve separate counts.

Outside of the Lower West Terrace Entrance, the location of some of the fiercest fighting, Ball joined other rioters in an attempt to break through a line of fully uniformed police officers desperately trying to keep the rioters from entering the United States Capitol. When that wasn't successful, Ball began throwing dangerous weapons at the line of officers.

First, Ball used an explosive device capable of inflicting damage to surrounding property as well as seriously injuring persons in the blast radius. The explosion itself occurred inside the entranceway packed tight with officers and caused injury to multiple officers. (*See Figure 1*). After seeing the explosion himself, Ball gestured to the officers in a manner that made his intent clear. (*See Figure 2*).

But the police line did not break.



*Figure 1*: The explosion captured by USCP CCTV



*Figure 2*: Immediately following the explosion, Ball is seen with a raised fist amid the crowd.

Ball then continued his violent behavior by throwing a large piece of wood at the line of police. Ball remained at the Lower West Terrace until police cleared the area nearly 25 minutes later.

In assessing Ball's "words and movements during the riot," this Court should consider that Ball entered the Capitol Building at 3:29 p.m. After spending approximately two minutes inside the Capitol, Ball went outside on the Upper West Terrace to smoke. After nearly an hour watching the events unfold, Ball made his way to the Lower West Terrace where he joined in the violence against officers guarding the Lower West Terrace entrance. Ball joined others in chants, shouting, and ultimately violence against officers.

The officers' injuries following Ball throwing the explosive device into the entranceway includes several officers suffering hearing loss. The extent of the injuries ranged from extremely painful ringing to impairment lasting months. Following the explosion officers were disoriented, and some believed they were going to die. Ball threw the explosive from deep in the crowd, as seen below, making it impossible for officers to know what was coming.



*Figure 1*: Ball amid the crowd throwing the explosive into the tunnel captured by open-source video

For some officers, the explosion was the most memorable event of the day. This—as the Court is aware—is already in the context of a violent mob storming the United States Capitol. To

date, Ball is the only individual charged with using an explosive to commit another felony, an offense so serious that Congress mandates a mandatory minimum ten-year sentence consecutive to any other sentence imposed following conviction.

In short, the nature and circumstances of the charged offenses are severe. Among other violent conduct, Ball threw an explosive device into a crowded entranceway filled with fully uniformed police officers.

Ball coordinated his efforts with other rioters while at the Capitol. At trial, Ball's coordination will be shown by joining fellow rioters in his push against the police line at the Lower West Terrace Entranceway (*See Figure 4, bottom left*), by handing weapons to other rioters, and by seeking gasoline from his fellow rioters after police had begun to push rioters of the Inaugural Stage. (*See Figure 4, bottom right*).



*Figure 2*: These screen grabs sample some of Ball's interaction and coordination with other members of the riot.

## 2. The Weight of the Evidence Against Daniel Ball.

The weight of the evidence, here, is overwhelming. The Government will provide the finder-of-fact with video evidence of each criminal act alleged in Ball's indictment. The United States Capitol Police Closed Caption Television System (USCP CCTV) recorded the activities on the Capitol Grounds from 17,000 different cameras; however, this is not the sole source of the Government's video evidence.

Ball's explosive is also captured by nearly 25 different body-worn cameras from the officers within the congested entranceway. Much like with the USCP CCTV, each of these sources are time stamped to provide any finder-of-fact with *when* Ball threw his explosive.

Ball's conduct was also captured by other rioters who recorded the events at the Capitol using cell phones, and by footage from multiple film crews that were also capturing the events on the West Front of the Capitol. Ball is captured committing his crimes by multiple cameras, which will provide any finder-of-fact with multiple angles to consider the charged offenses.

Unlike most criminal cases, the finder-of-fact will not have to decide whether it believes any testimony of what other witnesses experienced. Instead, the finder-of-fact will need only decide whether it believes the depictions that were captured on camera and then further corroborated by numerous angles of the same conduct. The weight and amount of this evidence is overwhelming.

Further, on top of the extensive video evidence, the finder-of-fact will still benefit from the receiving testimony from the officers that were inside the Lower West Terrace entranceway during Ball's assaults on them. Finally, Ball was interviewed by agents following his arrest and confirmed nearly every allegation made against him in the indictment. Ball informed agents that at the Lower West Terrace he threw—what he described as a 'm-100' explosive—into the tunnel packed with

officers. At least at the time of his arrest, Ball does not dispute the severity of his conduct. This factor weighs heavily in favor of detention.

### 3. The History and Characteristics of Daniel Ball.

Daniel Ball is already a convicted felon. In 2014 Ball plead no contest to Felony Domestic Battery by Strangulation in Citrus County, Florida and was sentenced to three years of probation. During that term of probation, Ball recorded three violations of his probation. On April 27, 2021—just three months after January 6—Ball committed Resisting an Officer with Violence and Battery on two Law Enforcement Officers and was sentenced to five years of probation. But that is not the full extent of Ball's criminal history.

Ball's criminal contacts include:[1] (1) Aggravated Assault in Citrus County in 2007; (2) Battery on Juvenile Probation Officer in Marion County in 2008; (3) Possession of Cannabis less than 20 grams in Citrus County in 2012; (4) Possession of Cannabis less than 20 grams in Citrus County, again in 2012; (5) Domestic Battery in Citrus County in 2013; (6) Violation of Probation for 2014 Domestic Battery Case; and (7) Domestic Battery in Citrus County in 2016.

Within Ball's history is also some deep telltale signs of drug addiction. From the specific contacts related to possession of cannabis, to the positive drug screens while on probation, to the underlying factual basis of his most recent felony conviction (Ball admitted to experiencing a "trip" after taking psilocybin mushrooms), Ball continues to abuse drugs. Further aggravating his drug abuse, Ball seemingly has no particular drug of choice.

Outside of the specific criminal contacts, this Court should also be concerned with Ball's conduct surrounding his arrest for *this* offense, and what was found in his home. Agents arrested

---

[1] The Government is attempting to obtain certified convictions for this Court's full assessment at the detention hearing.

Ball during a regularly scheduled meeting with his state probation officer. Ball's father drove Ball to his appointment and, after Ball's arrest, agents told Ball's father what occurred. According to Ball's father, Ball had said that if agents ever came to arrest Ball for his actions on January 6, he would "not let them take [him]." During a search of Ball's home, agents discovered ammunition for a .223 rifle and ammunition for a .762 rifle as well as a loaded—though unchambered—.22 rifle. Also, during the same search, agents found multiple commercially produced "m-style" explosive devices, the same style of device Ball would later tell agents he threw at officers on January 6. This factor weighs in favor of detention.

    **4.   The Nature and Seriousness of the Danger to Any Other Person and the Community.**

The facts discussed above show that, if released, the defendant would represent an ongoing danger specifically to law enforcement. Ball has a history of violence, including his most recently felony conviction for resisting law enforcement with violence. Tied with the statements made to his father, there is no condition that would provide this Court with reasonable assurance that Ball will not be a danger to himself or law enforcement if/when law enforcement must once again effectuate an arrest.

Ball has shown a history of being unable to follow conditions imposed by courts, a history of violent conduct, and a history of resisting law enforcement. Ball is charged with some of the most serious violent conduct at the United States Capitol involving violence *against law enforcement*. Ball understands the severity of his conduct at the Capitol, and even explained to family that he would not allow the FBI to "take him." There is no condition, or combination of conditions, that will reasonably assure the appearance of Daniel Ball or that will reasonably assure the safety of the community. Daniel Ball should be detained pending trial.

## Conclusion

For the reasons stated above, the Court should find that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of any other person and the community, pursuant to 18 U.S.C. § 3142(e). The Court should order the defendant detained pending trial.

Respectfully Submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

/s/ *Adam M. Dreher*
ADAM M. DREHER
Assistant United States Attorney
MI Bar No. P79246
601 D St. N.W.
Washington, D.C. 20530
(202) 252-1706
adam.dreher@usdoj.gov

MICHAEL L. JONES
Trial Attorney
DC Bar No. 1047027
601 D St. N.W.
(202) 252-7820
michael.jones@usdoj.gov